## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Jeffrey Brock, first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been since May 2016. I have served previously with the Lenexa Police Department for five and half years where I have experience in general investigation with narcotics and violent crimes. I am a graduate of Missouri Western State University with a bachelor's degree in criminal justice and a minor in psychology. I am also a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program and Special Agent Basic Training at the ATF National Academy, Glynco, Georgia. During my law enforcement career, I have conducted and participated in numerous firearms investigations surrounding the illegal possession, use, purchase, and sales of firearms. I have also participated in numerous investigations involving the unlawful distribution of narcotics in violation of federal and state laws, which led to arrests, convictions of violators, and seizures of narcotics and proceeds gained from illegal activity. In the course of my duties, I have conducted or participated in physical and electronic surveillance, undercover transactions, the execution of search warrants, debriefing of informants, interviews of witnesses, reviews of tape-recorded conversations involving drug trafficking activities, and analysis of telephone toll records and other records kept by or relating to drug traffickers and firearms dealers.

2. The statements in this Affidavit are based on my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

3. On June 12, 2024, ATF Special Agents received information from a Confidential Informant, CI-32611, (hereinafter "CI") who wished to speak about a subject, identified **as Dalton Johnston**, who was manufacturing Glock- and AR-type machine gun conversion devices (hereinafter "MCD") and selling them in the Kansas City, Missouri area. The CI also advised that **Johnston** was using a 3D printer to manufacture AR-15 type lower receivers, Glock pistol frames, and completed firearms. **Johnston** was known to drive a black BMW sedan. **Johnston** also communicated via Snapchat. A records check revealed that **Johnston** had a black BMW registered to him bearing Missouri license plate LK9S6Z.

4. On June 12, 2024, ATF SA Cody Fry and I conducted surveillance of **Johnson's** residence and observed **Johnston's** black BMW parked in the driveway. Also parked in the driveway was a black Chevrolet S-10 bearing Missouri license plate 4KFF94 which was registered to **Johnston**.

5. On June 17, 2024, the CI informed me that **Johnston** agreed to sell multiple Glock MCDs to an ATF Undercover Agent ("UC") for $30.00 apiece. The transaction was verbally agreed to occur on June 18, 2024. In the evening time of June 17, 2024, **Johnston** advised the CI that the selector rods for the Glock MCDs were not manufactured, and **Johnston** would not have time to complete them before the previously agreed time. The transaction was postponed.

6. On July 12, 2024, the CI informed me that **Johnston** advised the CI that he sold the Glock MCDs that were supposed to be sold to the UC to another customer. The CI did not know to whom the MCDs were sold.

7. On July 25, 2024, the CI advised that **Johnston** had shown him a suspected AR-type MCD. Johnston told the CI that the MCD was $20. **Johnston** further instructed the CI to give the MCD to the UC, get the money, and return the money to **Johnston**. **Johnston** further

advised the CI he would manufacture more MCDs and would sell directly to the UC. SA Cody Fry and I met the CI and took custody of the MCD. I recovered the MCD as evidence and secured it in the ATF Evidence Vault.

8. On August 2, 2024, SA Fry and I met with the CI who explained that **Johnston** agreed to sell ten 3D-printed Glock MCDs to the UC on that same date. The majority of the conversation the CI had with **Johnston** was in person, but some was communicated via Snapchat in these conversations, **Johnston** stated that the price for ten MCDs would be $35 (**Johnston** later raised it to $50). **Johnston** further stated he wanted to meet at the Casey's gas station, located at 4111 Blue Ridge Cutoff, Kansas City, Missouri, at 3:20 p.m.

9. On August 2, 2024, surveillance units were set up in that area of the **Johnston's** residence prior to the deal and observed **Johnston's** BMW parked in the driveway. At approximately 3:02 p.m., **Johnston** got into his BMW and left his residence. Surveillance attempted to follow **Johnston** but lost him traveling southbound on I-435 due to **Johnston** traveling at a high rate of speed. I-435 is the route **Johnston** would take from his residence to 4111 Blue Ridge Cutoff, Kansas City, Missouri. At approximately 3:21 p.m., the CI sent **Johnston** a Snapchat message stating that there are multiple law enforcement officers in the Casey's gas station parking lot and to move over to the Taco Bell parking lot, located at 4017 Blue Ridge Cutoff, Kansas City, Missouri, where the UC and the CI were waiting.

10. At approximately 3:22 p.m., **Johnston** arrived at the Casey's gas station, stopped for a few minutes, and then traveled next door to the Taco Bell parking lot. **Johnston** parked the BMW, walked over to the Undercover Vehicle, and got into the back seat at approximately 3:28 p.m.

11.     **Johnston** produced the ten Glock MCDs in a clear plastic zip lock bag, and the UC paid **Johnston** $70 ($50 for the ten Glock MCDs and $20 for the one AR type MCD previously given to the CI).

12.     When **Johnston** got into the Undercover Vehicle, he stated that he observed the large police presence upon arriving at the Casey's and that he frantically began to hide the package of Glock MCDs in order to avoid detection. **Johnston** explained that the ten Glock MCDs were incomplete as he did not manufacture the selector rod for them. During the conversation with the **Johnston**, the UC explained that he/she would be trafficking the MCDs to Chicago and selling them for a large profit. The UC asked **Johnston** if he could make larger quantities of the AR-type MCDs. **Johnston** advised that he could manufacture 50 or 100 MCDs. **Johnston** explained that he would sell 50 AR-type MCDs for $120 total. The UC asked **Johnston** if he would sell 100 AR-type MCDs for $250. **Johnston** agreed to manufacture and sell 100 AR-type MCDs to the UC. **Johnston** stated that he printed the MCDs himself and it would take him approximately one week. **Johnston** explained that he could manufacture AR-type firearms as well, but it would take him weeks to complete them. **Johnston** agreed to meet the UC the following week to sell the 100 MCDs. Following the transaction, the UC provided SA Fry with the ten Glock MCDs which were secured in an ATF Evidence Vault. Upon examination, investigators determined that these MCDs were missing a part, a rod, that would be required for the MCDs to be fully functioning.

4



13.   The Glock MCDs were sent to Cody Toy, ATF Firearms Enforcement Officer (FEO) for examination. FEO Toy advised that the Glock MCDs were designed and intended to convert a semi-automatic pistol into a machine gun, notwithstanding the missing rods. FEO Toy determined that the MCDs were designed and intended solely and exclusively for the use in converting a weapon into a machine gun; thus, a machine gun as defined in 26 U.S.C. § 5845(b). With the MCDs being machine guns, they are also firearms as defined in 26 U.S.C. § 5845(a)(6). They are machine guns as defined in 18 U.S.C. § 921(a)(24). They also lack manufacturer's marks of identification or serial numbers as required by 26 U.S.C. § 5842.

14.   On August 14, 2024, the CI contacted **Johnston** via Snapchat to confirm **Johnston** was available to meet on August 15, 2024, at 4111 Blue Ridge Cutoff Kansas City, Missouri, to sell the 100 MCDs to the UC.

5

15. On August 15, 2024, surveillance units were set up on the **Johnston's** residence prior to the deal. At approximately 3:27 p.m., **Johnston's** BMW was observed pulling out of the driveway. **Johnston** was observed driving the BMW out of the neighborhood. **Johnston** was surveilled to 4111 Blue Ridge Cutoff, Kansas City, Missouri, where he pulled in at approximately 3:46 p.m.

16. At approximately 3:47 p.m., **Johnston** entered the back seat of the Undercover Vehicle. **Johnston** provided the UC with a clear vacuum sealed package containing 100 AR-type MCDs. 86 were white in color and 14 were black in color.

17. The UC paid $250 to **Johnston** for the MCDs. **Johnston** also stated that he could manufacture and sell 300 AR-type MCDs within the next two weeks for $750. **Johnston** also provided the UC with his cell phone number. Following the transaction, the UC provided me with the MCDs, and I secured them in the ATF Evidence Vault. A photograph of the 300 AR-type MCDs is below.



18. One white and one black MCD that were purchased from Johnston were sent to ATF FEO Toy for examination. FEO Toy determined that both MCDs were designed and intended solely and exclusively for the use in converting a weapon into a machine gun; thus, a machine gun as defined in 26 U.S.C. § 5845(b). With the MCDs being machine guns, they are also firearms as defined in 26 U.S.C. § 5845(a)(6). They are both machine guns as defined in 18 U.S.C. § 921(a)(24). Neither item bear manufacturer's marks of identification or serial numbers as required by 26 U.S.C. § 5842.



19. On August 21, 2024, the UC contacted **Johnston** via text message to discuss another purchase of MCDs. **Johnston** stated that the 300 AR-type MCDs would be ready by August 22, 2024. **Johnston** further explained that he could manufacture Glock frames, but they only lasted between 50 and 500 rounds and take a long time to make. **Johnston** explained that to make a 3D-printed Glock frame last longer he would have to use carbon fiber nylon for which his printer is not set up for. On August 27, 2024, the UC and Johnston agreed to meet on August 30, 2024, to complete the transaction.

20. On August 30, 2024, surveillance units were in the area of the **Johnston's** residence prior to the deal between **Johnston** and the UC. **Johnston's** vehicles were parked in the driveway of his residence. At approximately 2:01 p.m., Johnston exited the residence carrying two brown cardboard boxes and entered his S-10 truck.

21. **Johnston** then drove the S-10 away from the residence. **Johnston** was surveilled from the residence to 4111 Blue Ridge Cutoff, Kansas City, Missouri. **Johnston** did not make any stops along the way and arrived at Casey's at approximately 2:18 p.m. At approximately 2:19

8

p.m., **Johnston** entered the front passenger seat of the Undercover Vehicle while holding two brown cardboard boxes. **Johnston** handed one of the boxes to the UC. The box contained a large quantity of AR-type MCDs. **Johnston** opened the other box which contain additional MCDs. **Johnston** showed the UC eight rods for the previously purchased Glock MCDs. The UC then paid **Johnston**.

22. During the deal, the UC stated that he/she would want to purchase 500 AR-type MCDs in the next few weeks. **Johnston** explained that he could manufacture that many in approximately one week. **Johnston** explained that he can 3D-print 45 AR type MCDs at one time and can print up to three batches per day if he has time. The UC asked **Johnston** if he could manufacture any silencers. **Johnston** explained that he can produce silencers. **Johnston** stated that silencers take longer to print than the MCDs, and they are only rated for .22 caliber firearms. **Johnston** explained that he usually charges $20.00 for the 3D-printed silencers. **Johnston** agreed to manufacture a silencer for the UC. The UC told **Johnston** that the UC would contact him via phone in the next week or so to confirm his/her order. At approximately 2:23 p.m., **Johnston** exited the undercover vehicle and left the area northbound on Blue Ridge Cutoff in his S-10. Surveillance units followed **Johnston** but lost him northbound on I-435 due to him driving at a high rate of speed. Visual was lost on **Johnston** for approximately 5 minutes before he arrived at his residence at approximately 2:43 p.m., as confirmed by stationary surveillance.

23. After **Johnston** departed the area, the UC provided me the two boxes containing 300 MCDs and the eight rods for the previously purchased MCDs, and I secured them in an ATF Evidence Vault.

9

**300 AR-type MCDs**





**Glock selector rods**




10

24. On September 4, 2024, I verified **Johnston** does not possess a Federal Firearms License ("FFL"). A check of FFL holders includes licensed importers, licensed manufacturers, and/or licensed dealers of firearms. Additionally, an FFL would be required to manufacture personally made machine guns. I also verified that **Johnston** does not have any NFA firearms (including machine guns) that are registered with ATF on the National Firearms Act register.

JEFFREY BROCK
Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to ~~before me~~   By telephone at 10:45 am

on this __24th__ day of September 2024.

HONORABLE W. BRIAN GADDY
United States Magistrate Judge
Western District of Missouri